[Cite as *In re A.B.*, 2025-Ohio-259.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

In re A.B.

Court of Appeals No. L-24-1231

Trial Court No. JC22291783

**DECISION AND JUDGMENT**

Decided: January 24, 2025

* * * * *

Emily McGill, for appellee.

Autumn D. Adams, for appellant.

* * * * *

**DUHART, J.**

{¶ 1} This is an appeal by appellant, As.B., the mother of child, A.B., from the September 16, 2024 judgment of the Lucas County Court of Common Pleas, Juvenile Division, granting permanent custody of A.B. to appellee, Lucas County Children's Services ("LCCS" or "the agency"). For the reasons that follow, we affirm the judgment.

{¶ 2} Mother sets forth one assignment of error:

It was not in [A.B.]'s best interest to be placed into the permanent custody of LCCS because there was still time left in the case and Mother was in compliance with case plan services, and almost completed case plan services.

## Background

{¶ 3} A.B. was born in May 2022, to mother and father, D.M. Mother also has an older child ("half-sibling") by another man, C.M. Father, the half-sibling and C.M. are not involved in this appeal but will be mentioned when pertinent to the case.

{¶ 4} The agency became involved with the family in May 2022, when it was reported that mother tested positive for opiates and Oxycodone and took Percocet within one week of A.B.'s birth; A.B. was born with drugs in her system. The agency opened a case, and an in-home safety plan was created with A.B.'s maternal grandmother as "oversight." Mother, A.B. and the half-sibling moved in with maternal grandmother.

{¶ 5} In October 2022, maternal grandmother told mother and the children to leave the home because mother allegedly emptied maternal grandmother's bank account and could not be trusted to not take maternal grandmother's pain medications. The agency created an out-of-home safety plan for A.B. to reside with father in paternal grandmother's home; mother went to a homeless shelter. Paternal grandmother had health problems and needed help caring for A.B., as father worked nights. The agency requested that father enroll A.B. in daycare so she would be cared for while he slept during the day. The agency informed father that it could assist with the daycare cost, but he did not enroll A.B. in daycare. In late November 2022, paternal grandmother told the agency she could no longer care for A.B. and asked that A.B.'s placement be changed.

{¶ 6} On November 28, 2022, the agency filed a complaint in dependency and neglect, and an emergency shelter care hearing was held that same day at which A.B. was

2.

ordered into the agency's interim temporary custody and placed in a foster home. Mother and C.M. consented to interim legal custody of the half-sibling being placed with C.M.

{¶ 7} On January 26, 2023, the adjudicatory hearing was held and mother and father consented to a finding that A.B. was neglected; the juvenile court adjudicated A.B. neglected. At the dispositional hearing, the court found no relatives were available as temporary custodians of A.B., so temporary custody was granted to the agency, with A.B. to remain in foster care. Mother and C.M. consented to, and the court ordered, temporary custody of the half-sibling to C.M. Also on that day, the initial case plan was filed.

{¶ 8} Sometime thereafter, A.B.'s placement changed from the foster home to her paternal great-aunt and uncle's home.

{¶ 9} In October 2023, A.B.'s placement with the paternal great-aunt and uncle ended due to serious health problems experienced by the uncle. A.B. was placed in the home of paternal cousins ("caregivers").

{¶ 10} On November 28, 2023, an annual review hearing was held where the following information was presented. Mother completed a dual assessment with a second provider and mental health and substance abuse treatment were recommended; she had not seen the provider since August 2023. Mother took a drug test in mid-November 2023, and she was positive for drugs. Mother's visits with A.B. were scheduled for once a week, but mother did not consistently visit A.B. Mother failed to secure housing. A.B. was very well-adjusted to the caregivers' home and was flourishing in her placement. The agency requested a six-motion extension of temporary custody for concurrent

3.

planning because the caregivers were interested in legal custody of A.B. and the kinship program and needed additional time. The agency also requested that C.M. be granted legal custody of the half-sibling. The juvenile court granted the agency's requests.

{¶ 11} On March 19, 2024, the agency filed a motion for permanent custody of A.B.

{¶ 12} On August 27, 2024, the permanent custody hearing was held.

{¶ 13} On September 16, 2024, the juvenile court issued its judgment entry awarding permanent custody of A.B. to the agency. Mother appealed.

### The Hearing

{¶ 14} Three witnesses testified at the permanent custody hearing: the caseworker, mother, and the Court Appointed Special Advocate ("CASA") volunteer. Father did not attend the hearing. The relevant witness testimony is summarized below.

**Caseworker Tracey Merrithew**

{¶ 15} Caseworker Merrithew testified that she worked for the agency and was the ongoing caseworker for A.B. and her family for the entirety of the case. Mother's case plan was for a dual diagnostic assessment, follow recommendations and secure housing. Mother completed the assessment, and it was recommended that she attend individual therapy, substance abuse services and psychiatric appointments once a month for medical assisted treatment. Mother initially participated in services, but her participation decreased over time.

4.

{¶ 16} Mother went to a second provider and completed another assessment, and it was recommended that she attend individual counseling sessions weekly, but mother and her provider decided to meet every other week. Mother attended one out of four sessions and did not receive substance abuse treatment from the second provider because mother went to the provider without a referral. Merrithew was unsure if mother completed any of the services because mother did not sign an up-dated release of information form, nor did mother provide any service records to Merrithew.

{¶ 17} Mother was supposed to submit to random drug screens, but complied only one time, on November 14, 2023. The result of the drug screen showed mother was positive for amphetamines, Oxycodone and Methadone. When Merrithew spoke with mother on the phone, Merrithew asked mother to take a drug test; mother would hang up.

{¶ 18} Mother's visits with A.B. were inconsistent. At one point, the agency required that mother arrive at the agency one hour before visits to ensure that she would show and was not tardy. If mother did not arrive at the agency one hour before the visit, the visit was cancelled. Thereafter, mother's visit improved to some degree, but by late 2023, visits were less consistent again, and mother was required to arrive at the agency two hours before visits; she was still inconsistent with visits.

{¶ 19} At the end of March 2024, pursuant to the visitation policy, A.B.'s name was taken off the visitation list because no visits were held for three weeks. Mother contacted Merrithew a few weeks later to reinstate visits. Mother's last visit with A.B. was on April 26, 2024. Thereafter, more visits were missed, so A.B.'s name was again

5.

taken off the visitation list. Mother called Merrithew to ask about visits; mother was very argumentative and hung up on Merrithew.

{¶ 20} Merrithew observed some of mother's visits with A.B., but mother would get "verbally agitated. She had no issue throwing profanities at [Merrithew] in front on the kids. And [mother] was just very verbally aggressive with [Merrithew]."

{¶ 21} In March 2024, mother was arrested for drug paraphernalia, use or possession and driving under a suspended driver's license.

{¶ 22} On May 1, 2024, a meeting was held at the agency with Merrithew, her supervisor, the CASA and mother and mother "blew up . . . she yelled and carried on and used profanities[.] . . . She blasted a lot of questions . . . and then before anyone had a chance to answer . . . she walked away." That was the last time Merrithew saw mother in person.

{¶ 23} In the six months before the permanent custody hearing, Merrithew's contact with mother was sparse and mother refused to give her address to Merrithew. Two or three weeks prior to the hearing, Merrithew and mother talked on the phone, but mother was very argumentative and accusative and hung up on Merrithew. Merrithew learned the morning of the hearing that mother said she was getting housing at the end of the week. Previously mother said she was obtaining housing, but it fell through. During the case, mother was couch-surfing at friends' houses.

{¶ 24} With respect to AB., she was initially placed in a foster home, then with paternal great-aunt and uncle. In October 2023, A.B. was moved to the caregivers'

6.

home, where she has remained. A.B. had a very good, healthy bond with the caregivers and was doing very well. A.B. was also doing well developmentally, so there was no need for services. If the agency was granted permanent custody of A.B., the caregivers wanted to adopt her.

{¶ 25} Merrithew believed that permanent custody to the agency was in A.B.'s best interest due to the inconsistencies with mother, the inconsistencies with mother's treatment for her mental health and substance abuse, and the instability with mother's housing for two years.

**Mother**

{¶ 26} Mother testified that she was living in a shelter in Michigan, but did not know the address. Later, she testified "I haven't been in a shelter for two days because I signed the lease to my house." She was asked where the house was located, and she said it was "in Detroit. I don't have the lease with me. It's in my car[.]" She was then asked if she signed the lease and she relied "It's supposed to be on Friday, at the latest Monday because they're finishing repairs to the house."

{¶ 27} Mother testified that in March of 2024, she was pulled over due to her window tint and she had a warrant for driving under suspension because she lost her license when she forgot to pay a ticket in Sandusky County when she was doing Instacart. She "had a food scale in the car, that's all. . . . Like, when you do meal prep, and you have to do one ounce of rice and three ounces of chicken." She "got charged with paraphernalia," went to court the next day and the charge was dropped to a disorderly

7.

conduct; she "got a fine." Mother said she had a food scale in the car "[b]ecause I was trying to do meal prep stuff. So do -- kind of like -- it goes with my mental health stuff. Try to eat better, because I won't eat for days[.]" She was not in a program, it was "[j]ust something to do on my own to try to help doing research in. Just overall bringing my health back into a better place." As to the status of her driver's license, she had to pay a $1,000 fine for a registration block, then she will get her license. Mother worked but did not have $1,000 to get her license, but was saving up for it; she "just put a deposit down for the house."

{¶ 28} Mother was asked where she worked, and she said she does housekeeping in the morning but was on call for the night too. When asked if she worked for a company or individual she said "[i]t's an individual company. So it's not, like, a big corporation. It's just a friend, through a friend that had a business and they were hiring and they got me locked in. I'm currently in the process of waiting back for my interview for Ford also."

{¶ 29} Mother testified that in May or June 2024, her counselor said the release form was valid. Mother did not get the records herself because she "wasn't asked to." She had mental health treatment, individual counseling, every week to every other week over the phone. She missed appointments between being homeless, she had a disagreement with the doctor for medication and there was miscommunication with her counselor and scheduling, but mother said she had been consistent with counseling since last summer or last fall, for sure.

8.

{¶ 30} Mother never had to take drug screens because the provider said mother was not recommended for substance abuse, despite what Merrithew said. Mother testified "[i]n the first assessment, I asked about the Vivitrol shot just to kind of keep my mom off me and everybody else off me accusing, but the Vivitrol shot made me sick. So I would have to go in for an assessment through the substance abuse part of Zepf Center if I wanted to do that. It was not a recommendation." The second assessment was at another provider in early 2023, and mother said the recommendation was for mental health and medication management but not substance abuse. She said she was compliant with her mental health services, but discontinued medication management.

{¶ 31} Regarding housing, mother testified that she never received assistance from the agency. She was told, after she got "put out" from father's mother's home, to go to the shelter, which she did and she enrolled in services. She was at the shelter for almost 30 days and worked enough to finance a car. One night she fell asleep in her car after work, she tried to take a nap before she went back to the shelter, but she did not wake up to her alarm, so she did not return to the shelter that night. The shelter ended her services, and she would have had to restart and "everybody there - there's a lot of mental health issues there. There's a lot of bedbugs there. There's a lot of drug users there[,]" so mother felt it was better to do things on her own.

{¶ 32} The reason that mother "flipped out" after the May 2024 review meeting was "because there was a review meeting the week before that I knew nothing about. And then her supervisor called my kids dirty when I asked -- said what I needed help

9.

with. And they said the Agency can't help with dirty children. I'm sorry, but my kids are never dirty." Mother did not sit down and talk because she does not sit down when she is anxious, and she stayed not even five minutes. She was asked if she had questions for the agency and she responded, "I always have questions for the Agency, and I never get an answer. I'm just being told I'm being argumentative." She was also asked if she stayed long enough to get answers to her questions, and she replied, "No, sweetheart, but I've called on the phone multiple times to talk to them." She sometimes left voicemails.

{¶ 33} Mother acknowledged that she hung up on Merrithew, but "[s]he's hung up because she said she's not dealing with me because I'm fucking annoying and that the case has gone on long enough, and she's not dealing with it today." Mother testified "[i]t's the runaround with her supervisor and her. And the last phone call she hung up on me because she said I was being argumentative."

{¶ 34} Mother was asked about visits with her other child, and she said

I don't have any right now. I have supervised visits. The night my phone got stolen I had to take $30 I owed to them. But that was that day I had to take it, and I couldn't access my Cash App, so they terminated it. I have to restart all over. So I am just going to try to hopefully go back when I'm more stable and have regular visitation because the supervised isn't good for him either."

{¶ 35} Mother wanted the juvenile court to know

I'm a very competent mother. At the time I had [A.B., she] was very colicky. She slept for an hour-and-a-half at a time. So that means that I was up constantly with her. I would feed her and hold her and soothe her, and get her back to sleep. My children never missed their doctor appointments. They were on time for all that, dentist, everything. My daughter and I are bonded, and the pictures that they have of my daughter on Facebook, she does not look happy. I have plenty of pictures of my

10.

daughter, and the difference even at visits when she looks way different. She knows who her mother is even though they took her so early.

And I'm trying so hard to do it with the best of me. It seems like no matter what I do or don't do, it's pointless. The only time I have communication with Tracy is when I call her and she finally answers. And, yes, we don't get along because she lies and manipulates, and it's frustrating. I can't get answers to my questions. I'm told I'm being argumentative. There would be something wrong if I'm not upset about what is going on with my kid because I am a good mother. I love my kids. If you knew what I've been through the last two years trying to get to where I am now, you wouldn't make it a day walking on the path that I have trying to make it work[.]

. . . And everybody beats up on me. But no matter what, I make it happen for my kids. This isn't the first time I've struggled, and I never have help. I do everything myself. So I love my kids and I do what I have to do to make it happen for them. I've cut relationships with people that were toxic and making it harder or sabotaging the progress I made. That includes my mom. So I can't - I can't go back and undo things.

**CASA Volunteer, Susan Gran**

{¶ 36} CASA Gran testified she was appointed in February 2024 for A.B. Gran spoke to mother only once, on May 1, 2024, after the 90-day review meeting was held. Mother was about 20-30 minutes late for the meeting, so it was held without her. When mother showed up, she was very agitated that the meeting occurred without her. Gran tried to explain to mother why the meeting was not delayed, and ultimately Merrithew and her supervisor appeared to meet with mother and Gran to go over what happened in the meeting. Mother would not sit down, was swearing and carrying on and kind of ranting and raving. She was asked about housing and said she obtained housing but did not have the address. She then said she was looking at two different places and would have something by the end of the week. When Merrithew asked mother to take a drug

11.

test, mother stormed out. The meeting with mother lasted about 10 to 15 minutes, but mother never found out what the recommendations were from the review meeting.

{¶ 37} Gran testified that A.B. seemed very well adjusted in the caregivers' home and was happy. Gran observed A.B. with the female caregiver, and they were bonded. Gran did not meet the caregivers' other child but understood that the children got along very well. The caregivers' home was very well equipped for children and was a very good environment for A.B. It appeared A.B. was reaching her developmental milestones and the caregivers were meeting all A.B.'s needs. The caregivers wanted to adopt A.B.

{¶ 38} Gran authored a report summarizing her investigation and recommended that permanent custody of A.B. be granted to the agency with the goal that A.B. be adopted. Gran thought it was in A.B.'s best interest because the caregivers' home was stable, and she did not feel that mother would be able to provide a stable environment for A.B. Gran noted mother did not "come up with an address" and did not "have an actual name of where [mother was] working." Gran did not think mother proved that the necessary changes were made for A.B. to have a stable environment.

{¶ 39} Gran testified she had mother's phone number but never spoke with mother on the phone due to mother's behavior at the meeting. Gran thought she may have tried to call mother multiple times and may have left a voice message. Gran never asked a parent to take a drug test because she could talk to the caseworker about that.

12.

### Permanent Custody Law

{¶ 40} The juvenile court may grant permanent custody of a child to a children services agency if the court finds, by clear and convincing evidence, two statutory prongs: (1) the existence of at least one of the factors set forth in R.C. 2151.414(B)(1)(a) through (e), and (2) the child's best interest is served by granting permanent custody to the agency. *In re M.B.,* 2005-Ohio-986, ¶ 6 (10th Dist.); R.C. 2151.353(A)(4).

### First Prong

{¶ 41} The relevant provisions of R.C. 2151.414(B)(1) state:

[T]he court may grant permanent custody of a child to a movant if the court determines . . . by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody . . . to the agency . . . and that any of the following apply:

(a) The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies . . . for [12] or more months of a consecutive [22]-month period . . . and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.
. . .

(d) The child has been in the temporary custody of one or more public children services agencies . . . for [12] or more months of a consecutive [22]-month period, or the child has been in the temporary custody of one or more public children services agencies . . . for [12] or more months of a consecutive [22]-month period[.]

{¶ 42} When calculating "12 of 22" time, the operative beginning date (when the child is considered to have entered the temporary custody of an agency) is the earlier of the date of the adjudication or 60 days after the removal of the child from the home. *In re A.C.*, 2006-Ohio-3337, ¶ 11 (9th Dist.). The operative ending date is the date the motion

13.

for permanent custody was filed. *Id.* at ¶12, citing *In re C.W.*, 2004-Ohio-6411, ¶ 24 ("'[A] motion for permanent custody must allege grounds that currently exist.' *In re K.G.*, 2004-Ohio-1421[,] * * * ¶ 13 [(9th Dist.)].) R.C. 2151.414(B)(1)(d) does not require 22 months of agency involvement before an agency seeks permanent custody of a child, it only requires that the child has been in an agency's temporary custody for 12 or more months of a consecutive 22-month period. *In re N.M.P.*, 2020-Ohio-1458, ¶ 22-24.

**Second Prong**

{¶ 43} To satisfy the second prong, the agency must establish, by clear and convincing evidence, that permanent custody of the child to the agency is in the child's best interest based on an analysis under R.C. 2151.414(D). The R.C. 2151.414(D)(1) factors are:

> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
> (c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period . . . ;
> (d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
> (e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

{¶ 44} Clear and convincing evidence requires proof which "produce[s] in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

14.

In order to determine whether a juvenile court based its judgment on clear and convincing evidence, the reviewing court examines the record to decide whether the trier of fact had sufficient evidence before it to satisfy the appropriate degree of proof. *State v. Schiebel*, 55 Ohio St.3d 71, 74 (1990).

**Judgment Entry**

{¶ 45} In its September 16, 2024 judgment, the juvenile court found, by clear and convincing evidence, that A.B. cannot or should not be placed with her parents within a reasonable time, in accordance with R.C. 2151.414(B)(1)(a), and A.B. was in LCCS's temporary custody for 12 or more months of a consecutive 22 months, in accordance with R.C. 2151.414(B)(1)(d). The court also found, by clear and convincing evidence, that a grant of permanent custody to LCCS was in A.B.'s best interest, under R.C. 2151.414(D). The court therefore granted LCCS's motion for permanent custody.

{¶ 46} The court detailed the testimony and evidence offered at trial, upon which it relied in reaching its findings of fact and conclusions of law. The court noted the case plan services offered to mother and that she completed two dual diagnostic assessments, one on October 19, 2022, and the second on January 9, 2023, and she initially attended services consistently, but her attendance dropped off. During the case, mother missed multiple random drug screens, and her last screen, in November 2023, was positive for amphetamine, methamphetamine and Oxycodone. A drug screen request was submitted on March 1, 2024, and mother said she would go, but did not. Housing was a problem for mother throughout the case. Mother's visits with A.B. were inconsistent and she was

15.

often late to visits and sometimes cancelled or missed visits. Mother's last visit was on April 26, 2024; mother then cancelled one visit and had two no-call, no-shows.

{¶ 47} The court observed A.B. was doing well in her current placement, the caregivers were meeting all her needs and A.B. interacted well with the caregivers' other child.

{¶ 48} The court found, as to mother, that under R.C. 2151.414(E)(1), notwithstanding reasonable case planning and diligent efforts by LCCS to assist mother to remedy the problems that initially caused A.B. to be placed outside of the home, mother did not consistently engage in substance abuse and mental health treatment, she tested positive for drugs, and she did not have stable housing.

{¶ 49} The court further found, under R.C. 2151.414(E)(2), that mother suffered from such severe chronic mental illness and chemical dependency that she was unable to provide an adequate permanent home for A.B. at the present time, and it was highly unlikely that mother would remedy her issues within one year from the trial date. Mother completed a dual assessment which recommended substance abuse services, individual therapy and psychiatric medication management, but was inconsistent in her attendance at these services, and LCCS received no information that she successfully completed her services. Mother's last drug screen was positive, she failed to appear for a drug screen on March 1, 2024, and she stormed out of a meeting in May 2024 when the caseworker mentioned a drug screen.

16.

{¶ 50} The court further found, under R.C. 2151.414(E)(4), that mother demonstrated a lack of commitment toward A.B. by failing to regularly support or visit when able, or by other actions showing an unwillingness to provide an adequate permanent home for A.B.

{¶ 51} The court further found, under R.C. 2151.414(B)(1)(d), that A.B. was in LCCS's temporary custody for 12 or more months of a consecutive 22-month period, as she was in LCCS's temporary custody since January 26, 2023, and LCCS filed its motion for permanent custody on March 19, 2024, which was 13 months, 22 days.

{¶ 52} The court further found that LCCS provided clear and convincing evidence that a grant of permanent custody was in A.B.'s best interest.  The court considered R.C. 2151.414(D)(1)(a) through (e) factors and set forth its analysis.  The court discussed mother's visits, her anger, the CASA's recommendation that permanent custody of A.B. be awarded to LCCS, A.B.'s custodial history of living with mother, LCCS's interim temporary custody then temporary custody, mother's little to no appreciable progress in her case plan services which supported that reunification could not timely occur, and the caregivers' preference to adopt A.B. to provide her with stability and permanency.

{¶ 53} The court noted that in closing arguments, mother's counsel suggested that legal custody of A.B. to a relative might be more appropriate.  The court found, however, that no relative filed a request for legal custody of A.B., and no evidence was offered that the current relative caregivers were willing to take legal custody.  The court therefore

17.

found that a legally secure permanent placement for A.B. could not be achieved without a grant of permanent custody to LCCS.

### Mother's Assignment of Error

{¶ 54} Mother argues that although A.B. was in LCCS's custody for 12 months out of a consecutive 22-month period, it was not in A.B.'s best interest to be placed into LCCS's permanent custody because mother would be able to provide a legally secure home before the expiration of the case. Mother asserts she had almost completed case plan services, but LCCS was not interested in verifying that compliance. She contends her work on case plan services and almost completing those services, negated the juvenile court's findings under R.C. 2151.414(D)(1)(a) through (e).

{¶ 55} Mother submits the case opened on November 29, 2022, and the permanent custody trial was held on August 27, 2024, which allowed another three months for LCCS to verify her compliance with treatment and clear up confusion as to what was on her treatment plan, and for mother to show that she moved into and was able to maintain secure and safe housing for A.B.

{¶ 56} Mother also asserts that contrary to the court's finding that no evidence was presented that the relative caregivers were willing to take legal custody, LCCS's own evidence showed it explored legal custody with the relative caregivers. Mother asserts LCCS requested a six-month extension "because the foster parents were 'also interested in the K-Gap, the kinship program'" as they were interested in legal custody of A.B.

18.

Mother argues since "LCCS did discuss legal custody with the foster parents," that was an option for the court to consider.

**Standard of Review**

{¶ 57} In *In re Z.C.,* 2023-Ohio-4703, the Supreme Court of Ohio clarified the standard of review in permanent custody cases, and held:

> Given that R.C. 2151.414 requires that a juvenile court find by clear and convincing evidence that the statutory requirements are met, we agree with those appellate courts that have determined that the sufficiency-of-the-evidence and/or manifest-weight-of-the-evidence standards of review are the proper appellate standards of review of a juvenile court's permanent-custody determination, as appropriate, depending on the nature of the arguments that are presented by the parties.

*Id.* at ¶ 11.

{¶ 58} Sufficiency of the evidence and manifest weight of the evidence are "distinct concepts and are 'both quantitatively and qualitatively different.'" *Id.* at ¶ 13, quoting *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 10, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 678 (1997), paragraph two of the syllabus. "We have stated that 'sufficiency is a test of adequacy,' . . . while weight of the evidence 'is not a question of mathematics, but depends on its effect in inducing belief.'" (Emphasis sic.) *Id.*, quoting *Thompkins* at 387, quoting Black's Law Dictionary (6th Ed. 1990). *See also In re E.C.*, 2024-Ohio-281, ¶ 71-73 (6th Dist.).

**Analysis**

{¶ 59} Upon review of the arguments presented by mother, we find the manifest weight of the evidence standard applies to our examination of the juvenile court's decision.

19.

**First Prong of the Permanent Custody Test**

{¶ 60} The juvenile court found R.C. 2151.414(B)(1)(a) applied to mother, that A.B. cannot or should not be placed with either parent within a reasonable time. Based on our review of the record, as summarized above, we conclude there is clear and convincing evidence in the record to support the juvenile court's decision that A.B. cannot or should not be placed with either parent within a reasonable time. The record shows the CASA and caseworker testified at the permanent custody hearing that mother's visits with A.B. were inconsistent, the last visit was four months before the hearing, mother did not have stable housing, and mother did not comply with her case plan services for random drug screens and treatment for substance abuse and mental health.

{¶ 61} We also conclude there is clear and convincing evidence in the record to support the juvenile court's decision, under R.C. 2151.414(B)(1)(d), that A.B. was in LCCS's temporary custody for at least 12 months of a consecutive 22-month period.

{¶ 62} We therefore find the first prong of the permanent custody test satisfied.

**Second Prong of the Permanent Custody Test**

{¶ 63} The juvenile court found that permanent custody of A.B. to LCCS was in her best interest because, inter alia, mother failed continuously and repeatedly to substantially remedy the conditions which caused A.B. to be placed outside of the home, mother failed to consistently participate in substance abuse treatment and mental health treatment, mother made little to no appreciable progress in her case plan services, mother failed to appear for random drug screens and mother failed to have stable housing.

20.

**{¶ 64}** Upon review, the record reflects that A.B. has been with the caregivers since October 2023, she was doing very well and the caregivers wanted to adopt her. The CASA recommended that it was in A.B.'s best interest for the agency to have permanent custody because the caregivers' home was stable, and mother would not provide a stable environment for A.B. In addition, caseworker Merrithew believed that permanent custody of A.B. to the agency was in A.B.'s best interest due to the mother's instability with housing and inconsistencies with mental health and substance abuse treatment.

**{¶ 65}** Based on our review of the record, as summarized above, we conclude the juvenile court had before it clear and convincing evidence that granting permanent custody of A.B. to LCCS was in her best interest, and the juvenile court's decision to grant permanent custody to LCCS is supported by competent, credible evidence and is not against the manifest weight of the evidence. While there may have been time left in the case, as argued by mother, during the over two years that the agency was involved with the family, mother was not in compliance with case plan services, as she did not attend either substance abuse treatment or mental health treatment consistently, she did not make herself available for random drug screens by the agency, she tested positive for drugs when she did screen, and she did not have stable housing at any point throughout the agency's involvement.

**{¶ 66}** We therefore find the second prong of the permanent custody test satisfied.

**{¶ 67}** In light of the foregoing, mother's assignment of error is found not-well taken.

21.

**{¶ 68}** On consideration whereof, the judgment of the Lucas County Court of Common Pleas, Juvenile Division, is affirmed.  Mother is ordered to pay the court costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Christine E. Mayle, J.                        _____
                                                JUDGE

Myron C. Duhart, J.

                                   _____
Charles E. Sulek, P.J.                             JUDGE
CONCUR.

                                     _____
                                                JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions.  Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.